William T. McCORMICK,
Plaintiff–Appellant,

v.

AT & T TECHNOLOGIES, INC.; Cameron Allen, Defendants–Appellees.

No. 88–3542.

United States Court of Appeals,
Fourth Circuit.

Argued June 5, 1990.

Decided May 28, 1991.

As Amended June 21, 1991.

Thomas Hunt Roberts, Richmond, Va., argued (Malvin W. Brubaker, Richmond, Va., on the brief), for plaintiff-appellant.

Paul Michael Thompson, Hunton & Williams, Richmond, Va., argued (Martin J.

Barrington, Hunton & Williams, Richmond, Va., on the brief), for defendants-appellees.

Before RUSSELL, WIDENER, PHILLIPS, MURNAGHAN, SPROUSE, CHAPMAN, and WILKINS, Circuit Judges, sitting en banc.*

CHAPMAN, Circuit Judge:

The issue presented here is whether an employee's state law claims against his employer for intentional infliction of emotional distress, negligent infliction of emotional distress, conversion, and negligence in the care of a bailment are preempted by § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185(a). The employee's claims arose out of his employer's disposal of the contents of his work locker upon his discharge. The district court ruled that because resolution of the state law claims would require interpretation of the collective bargaining agreement to determine whether the employer was authorized to act as it did, the state law claims were preempted by § 301.

We affirm.

I.

William T. McCormick was employed by AT & T Technologies, Inc. ("AT & T") in Richmond, Virginia, until his discharge in October, 1986. During his employment with AT & T, McCormick was a member of a collective bargaining unit whose exclusive bargaining agent was the Communications Workers of America ("the union"). The terms and conditions of McCormick's employment were governed by a collective bargaining agreement between AT & T and the union. The agreement vested McCormick with numerous rights and benefits including the right to grieve and arbitrate employment disputes.

On September 11, 1986, McCormick left his job at AT & T claiming to be ill. He did not return to work, and on September 26, 1986, AT & T notified him by registered letter that his employment would be terminated if he did not report to work by Sep-

tember 30, 1986. McCormick did not report and AT & T terminated his employment by letter dated October 1, 1986. McCormick's termination was made effective September 22, 1986.

On October 2, 1986, Cameron Allen, McCormick's supervisor at AT & T, was notified of McCormick's termination. Allen opened McCormick's work locker to remove tools that had been issued him by AT & T. Allen also removed McCormick's personal belongings and discarded them. Allen later was confronted by the union shop steward regarding McCormick's locker. The steward told Allen that other employees had rummaged through the trash and found a personal letter addressed to McCormick. According to the steward, the letter had been read by several of McCormick's co-workers.

On October 3, 1986, McCormick returned to AT & T. During a meeting at which McCormick was represented by a union steward, McCormick offered excuses as to why he had failed to report to work. AT & T decided to void the termination letter, and McCormick returned to his job. Later that day, McCormick reported to AT & T that he had been made the subject of a personal remark related to the letter retrieved from the trash by his co-workers. AT & T transferred McCormick to an area where he could work alone. Nonetheless, McCormick left the building later that evening never to return. AT & T terminated McCormick's employment for job abandonment effective October 3, 1986.

In December, 1987, McCormick filed a complaint in the Circuit Court of Henrico County, Virginia, against AT & T and Allen, alleging that under Virginia tort law the company's actions in disposing of the contents of his locker constituted intentional infliction of emotional distress, negligent infliction of emotional distress, conversion, and negligence in the care of a bailment. AT & T petitioned for removal to federal court pursuant to 28 U.S.C. § 1441 arguing that the federal court had original jurisdic-

---

* Judge Wilkinson was a member of the court which heard oral argument in this case, but later recused himself. Judge Niemeyer did not participate in the consideration of this case.

tion pursuant to § 301 of the Labor Management Relations Act ("LMRA"). AT & T subsequently moved for summary judgment asserting that McCormick's claims were preempted by § 301 of the LMRA, and that any claims McCormick might have had under § 301 were barred by his failure to exhaust his contractual remedies and by the applicable statute of limitations. McCormick moved to remand the action to state court and filed a memorandum in opposition to AT & T's summary judgment motion.

On March 29, 1988, the district court denied McCormick's motion to remand. It found that McCormick's state law claims were preempted and therefore properly removed to federal court. The district court granted AT & T's motion for summary judgment because McCormick's claims were time barred by the six-month statute of limitations governing § 301 actions.

McCormick appeals, and we affirm.

## II.

McCormick concedes, as he must, that if his state law claims are preempted by § 301 of the LMRA, then the district court acted correctly in granting AT & T's motion for summary judgment. This is so because if the state law claims are preempted, it is plain that the case was properly removed to federal court, *see Caterpillar Inc. v. Williams*, 482 U.S. 386, 393–94, 107 S.Ct. 2425, 2430–31, 96 L.Ed.2d 318 (1987); *Avco Corp. v. Aero Lodge No. 735*, 390 U.S. 557, 560–62, 88 S.Ct. 1235, 1237–38, 20 L.Ed.2d 126 (1968), and that any federal claims McCormick might have had were barred by § 301's six-month statute of limitations, *see DelCostello v. International Bhd. of Teamsters*, 462 U.S. 151, 169, 103 S.Ct. 2281, 2293, 76 L.Ed.2d 476 (1983); *Kirby v. Allegheny Beverage Corp.*, 811 F.2d 253, 256 (4th Cir.1987).

Thus, the only question is whether McCormick's state law claims are preempted by § 301. For the reasons that follow, we hold that his state law claims are indeed preempted.

## A.

Section 301 of the LMRA provides:

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a). Section 301 not only provides federal courts with jurisdiction over employment disputes covered by collective bargaining agreements, but also directs federal courts to fashion a body of federal common law to resolve such disputes. *See AllisChalmers Corp. v. Lueck*, 471 U.S. 202, 209, 105 S.Ct. 1904, 1910, 85 L.Ed.2d 206 (1985). Moreover, "the preemptive force of § 301 is so powerful as to displace entirely any state cause of action 'for violation of contracts between an employer and a labor organization.'" *Franchise Tax Bd. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 23, 103 S.Ct. 2841, 2853, 77 L.Ed.2d 420 (1983). "State Law is thus 'pre-empted' by § 301 in that only the federal law fashioned by the courts under § 301 governs the interpretation and application of collective bargaining agreements." *United Steelworkers of America v. Rawson*, —— U.S. ——, 110 S.Ct. 1904, 1909, 109 L.Ed.2d 362 (1990).

In *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988), the Supreme Court reiterated its test to determine exactly when state laws are preempted by § 301. Consistent with its approach in earlier cases, the Court in *Lingle* emphasized that "state law is pre-empted by § 301 ... only if such application requires the interpretation of a collective-bargaining agreement." *Id.* 108 S.Ct. at 1885; *see also IBEW, AFL–CIO v. Hechler*, 481 U.S. 851, 863 n. 5, 107 S.Ct. 2161, 2168–69 n. 5, 95 L.Ed.2d 791 (1987) (approving preemption where plaintiff conceded that "[t]he nature and scope of the duty of care owed Plaintiff is determined by reference to the collective bargaining

agreement"); *Allis–Chalmers*, 471 U.S. at 220, 105 S.Ct. at 1915–16 (approving preemption if application of state law "substantially depend[s] upon analysis of the terms of an agreement made between the parties in a labor contract"). Thus, the question in preemption analysis is not whether the source of a cause of action is state law, but whether resolution of the cause of action requires interpretation of a collective bargaining agreement. This approach advances § 301's goal of "ensur[ing] uniform interpretation of collective bargaining agreements, and thus ... promot[ing] the peaceable, consistent resolution of labor-management disputes." *Lingle*, 108 S.Ct. at 1880 (discussing *Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962)).

■ Section 301 does not, however, displace entirely state law in the labor relations context. "[A] State may provide [substantive rights] to workers when adjudication of those rights does not depend upon the interpretation of [collective bargaining] agreements." *Lingle*, 108 S.Ct. at 1883. The *Lingle* Court made clear that mere parallelism between the facts and issues to be addressed under a state law claim and those to be addressed under § 301 does not render the state-law analysis dependent on the collective bargaining agreement. Thus, "even if dispute resolution pursuant to a collective-bargaining agreement, on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for § 301 pre-emption purposes." *Id.*

Following the analysis of the Supreme Court in *Lingle*, we next examine the elements of the state law causes of action advanced by McCormick so that we may determine whether resolution of his state law claims requires interpretation of the collective bargaining agreement.

### B.

■ McCormick maintains that management actions in disposing of the contents of his locker amount to intentional infliction of emotional distress, negligent infliction of emotional distress, conversion, and negligence in the care of a bailment. Under Virginia tort law, a necessary element of each of McCormick's causes of action is an allegation of some sort of wrongful conduct. The intentional infliction of emotional distress cause of action requires that the defendant's conduct be "outrageous and intolerable." *Womack v. Eldridge*, 215 Va. 338, 210 S.E.2d 145, 148 (1974). The negligent infliction of emotional distress action requires, obviously enough, that defendant have engaged in negligent conduct. *See Hughes v. Moore*, 214 Va. 27, 197 S.E.2d 214, 219 (1973). Virginia law defines conversion as "any *wrongful* exercise or assumption of authority, personally or by procurement, over another's goods, depriving him of their possession." *Buckeye Nat'l Bank v. Huff & Cook*, 114 Va. 1, 75 S.E. 769, 772 (1912) (emphasis added). Finally, for negligence in the care of a bailment to exist, defendant must have *negligently* failed in the "duty to account for the thing as the property of another...." *K–B Corp. v. Gallagher*, 218 Va. 381, 237 S.E.2d 183, 185 (1977).

■ In addition, Virginia follows the general rule that plaintiff bears the burden of demonstrating wrongfulness. "In a negligence action, it is the plaintiff's burden to prove how and why the accident happened." *Hoffner v. Kreh*, 227 Va. 48, 313 S.E.2d 656, 658 (1984). Such wrongfulness cannot be determined in a vacuum. Rather, "[t]he degree of care required ... varies according to the circumstances of each case." *Holland v. Edelblute*, 179 Va. 685, 20 S.E.2d 506, 507 (1942). "Outrageousness" for purposes of intentional infliction of emotional distress is also not an independent, nonnegotiable standard of behavior. *Miller v. AT & T Network Systems*, 850 F.2d 543 (9th Cir.1988). Here, as elsewhere, "[t]he conduct of the reasonable person will vary with the situation with which he is confronted." Prosser & Keeton on Torts § 32, at 175 (5th ed. 1984). To prove conduct wrongful, a plaintiff must thus demonstrate not that the conduct was

wrongful in some abstract sense, but wrongful under the circumstances.

The circumstances that must be considered in examining management's conduct are not merely factual, but contractual, and the collective bargaining agreement is a crucial component of these circumstances. Cleaning out a locker is not a matter of intrinsic moral import but a question of legal authority—whether management had the lawful right to proceed as it did. The rightness or wrongness of the action has not been committed to the common law of tort, but to the legal arrangements embodied in a contractual agreement, in this case through collective bargaining. State tort claims are preempted where reference to a collective bargaining agreement is necessary to determine whether a "duty of care" exists or to define "the nature and scope of that duty, that is, whether, and to what extent, the [employer's] duty extended to the particular responsibilities alleged by [the employee] in h[is] complaint." *Hechler*, 481 U.S. at 862, 107 S.Ct. at 2168. Whether the actions of management personnel in disposing of the contents of McCormick's locker were in any way wrongful simply cannot be determined without examining the collective bargaining agreement to ascertain the extent of any duty AT & T may have owed him.

Although management's rights and responsibilities regarding employee lockers are not explicitly delineated in the agreement, a collective bargaining agreement "is more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate." *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 578, 80 S.Ct. 1347, 1351, 4 L.Ed.2d 1409 (1960). There are several general provisions in the collective bargaining agreement between AT & T and the union which are relevant to the resolution of employee complaints such as McCormick's. For example, a clause entitled "Management of the Business" states that "[t]he right to manage the business and to direct the working forces and operations of the same, subject to the limitations of this agreement, is exclusively vested in, and retained by, the Company." The agreement also establishes a grievance process to handle all employee disputes "arising with respect to wages, hours of work and other conditions of employment." The agreement specifies that employees have the right to present their complaints either to management or the union, and provides for formal arbitration procedures under which "[a]ny dispute arising between the union and the company with respect to interpretation of any provision of this Agreement or the performance of any obligation hereunder may be referred, during the life of this Agreement, to an arbitrator."

These provisions of the collective bargaining agreement apply generally to the conditions of employment for union employees at AT & T. The issuance of work lockers and tools by the company plainly is among these conditions of employment. The specifics as to management conduct regarding the lockers and tools need not be spelled out in all their detail and refinement for the collective bargaining agreement to be applicable. Rather, the collective bargaining agreement consists, in addition to its express provisions, of an "industrial common law—the practices of the industry and the shop—[which] is equally a part of the collective bargaining agreement although not expressed in it." *United Steelworkers*, 363 U.S. at 581–82, 80 S.Ct. at 1352. "There are too many people, too many problems, too many unforeseeable contingencies to make the words of the contract the exclusive source of rights and duties.... [T]he governmental nature of the collective-bargaining process demand[s] a common law of the shop which implements and furnishes the context of the agreement." *Id.* at 579, 80 S.Ct. at 1351 (quoting Cox, *Reflections Upon Labor Arbitration*, 72 Harv.L.Rev. 1482, 1498–99 (1959)). Thus, the agreement creates in employees and their employers implied rights and duties, the contours of which are a matter "of federal contract interpretation." *AllisChalmers*, 471 U.S. at 215, 105 S.Ct. at 1913. Here, interpretation of the collective bargaining agreement is essential to determine whether and to what extent

AT & T owed McCormick a duty concerning his work locker. If management owed him no duty and was entitled under the agreement to dispose of the contents of his locker in the manner it did, its actions *ipso facto* could not have been wrongful under state law.

For example, to determine under Virginia law whether an actor's behavior is "outrageous and intolerable," and therefore punishable as intentional infliction of emotional distress, requires an inquiry into whether the actor was legally entitled to act as he or she did. "The actor is never liable ... where he has done no more than to insist upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress." Restatement (Second) Torts (1965). If management's actions in disposing of the contents of McCormick's locker were authorized under the collective bargaining agreement, those actions could not simultaneously be considered "outrageous and intolerable" under Virginia law. Thus, "[b]ecause [McCormick's] intentional infliction of emotional distress claim consists of allegedly wrongful acts directly related to the terms and condition of h[is] employment, resolution of h[is] claim will be substantially dependent on an analysis of the terms of the collective bargaining agreement under which [he] is employed." *Douglas v. American Information Technologies Corp.*, 877 F.2d 565, 573 (7th Cir. 1989); *see also Newberry v. Pacific Racing Ass'n*, 854 F.2d 1142, 1149–50 (9th Cir. 1988); *Miller*, 850 F.2d at 551. Accordingly, preemption under § 301 is mandated.

McCormick's three remaining causes of action all arise from the identical incident. Each charges the same management personnel with the same wrongful conduct. Each focuses upon the justification for AT & T management to clean out McCormick's locker as it did. Just as the intentional infliction of emotional distress claim clearly requires interpretation of the collective bargaining agreement to determine whether the alleged conduct was "outrageous and intolerable," so do each of the other charges require recourse to the agreement to determine whether the alleged conduct was "negligent" or "wrongful." "When a court is called upon to decide whether an employer acted reasonably, the possibility that the [collective bargaining agreement] permitted the employer's behavior would strongly support the claim of reasonableness, unless the state had imposed some specific standard disallowing agreements that permit such behavior." *Miller*, 850 F.2d at 549. Management simply could not have acted negligently or wrongfully if it acted in a manner contemplated by the collective bargaining agreement. Thus, just as the necessity of construing the collective bargaining agreement dictates that the intentional infliction tort claim be preempted, so too it dictates that the three associated claims likewise be preempted.

### C.

Our holding that McCormick's state law claims are preempted by § 301 is consistent with the holding of the Seventh Circuit in *Douglas v. American Information Technologies Corp.*, 877 F.2d 565 (7th Cir.1989), and the holding of the Ninth Circuit in *Newberry v. Pacific Racing Ass'n*, 854 F.2d 1142 (9th Cir.1988). In these cases, both decided post-*Lingle*, the Seventh and Ninth Circuits considered and rejected claims by employees that their state law intentional infliction of emotional distress claims were not preempted by § 301. As the Seventh Circuit stated:

> Because [the employee's] intentional infliction of emotional distress claim consists of allegedly wrongful acts directly related to the terms and conditions of her employment, resolution of her claim will be substantially dependent on an analysis of the terms of the collective bargaining agreement under which she is employed. A court will be required to determine whether her employer's conduct was authorized by the explicit or implicit terms of the agreement. Therefore, we hold that [the employee's] state-law claim is preempted and must be pursued as a section 301 claim.

*Douglas*, 877 F.2d at 573; *see also Newberry*, 854 F.2d at 1149–50 ("A determination

of the validity of [plaintiff's] emotional distress claim will require us to decide whether her discharge was justified under the terms of the collective bargaining agreement. Her claim therefore cannot be decided without interpreting or analyzing the terms of the agreement. It is therefore preempted ..."). Moreover, the analysis in both *Douglas* and *Newberry* comports in all respects with the § 301 preemption jurisprudence in the Seventh and Ninth circuits. *See, e.g., Sluder v. United Mine Workers*, 892 F.2d 549 (7th Cir.1989); *Laws v. Calmat*, 852 F.2d 430 (9th Cir.1988); *Utility Workers v. Southern California Edison Corp.*, 852 F.2d 1083 (9th Cir.1988); *Hyles v. Mensing*, 849 F.2d 1213 (9th Cir. 1988).

In addition, our holding follows the prior decisions of this circuit in *Willis v. Reynolds Metals Co.*, 840 F.2d 254 (4th Cir. 1988), and *Kirby v. Allegheny Beverage Corp.*, 811 F.2d 253 (4th Cir.1987). In *Willis* we held preempted an employee's state law privacy, slander, and intentional infliction claims arising out of her employer's investigation of possible employee harassment and its confrontation of the suspected employee. We stated that the state tort claims were preempted because they "purport[ed] to give meaning to the terms of the labor contract." *Willis*, 840 F.2d at 255. Similarly, in *Kirby* we held that an employee's state law invasion of privacy claim arising out of his submission to a search of his person by his employer was preempted because recourse to the collective bargaining agreement was necessary to determine whether the employer was authorized to require such a search. *See Kirby*, 811 F.2d at 155–56. Because resolution of the state law claims in each of these cases required analysis of the collective bargaining agreements, the claims were preempted by § 301. The results in these cases are consistent with the result reached by the Supreme Court in *Lingle*, and the cases therefore retain their vitality after that decision.

There are few workplace quarrels that could not be framed as some form of tortious conduct. Our holding that McCormick's state law claims are preempted by

§ 301 protects the continued vitality of grievance procedures as a fair and efficient means for the resolution of labor disputes, and it also furthers the uniformity concerns underlying § 301. The Supreme Court has noted that "[t]he possibility that individual contract terms might have different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements." *Lucas Flour*, 369 U.S. at 103, 82 S.Ct. at 577. In this case, the collective bargaining agreement between AT & T and the union covers employees in several states. To exempt McCormick's claims from preemption would be to invite the courts of these states to give conflicting constructions to the single collective bargaining agreement in determining whether management conduct is wrongful.

### III.

For the foregoing reasons, we hold that McCormick's state law tort claims are preempted by § 301 of the Labor Management Relations Act. Any claims he may have had under § 301 are barred by the statute's six-month statute of limitations. *See Delcostello*, 462 U.S. at 169, 103 S.Ct. at 2293. The judgment of the district court is

AFFIRMED.

PHILLIPS, Circuit Judge, dissenting:

I disagree fundamentally with the majority's view of the way in which the preemptive effect of § 301 upon state-law tort claims is to be analyzed. Analyzed as I believe the most relevant Supreme Court precedents require, none of the tort claims in issue here-whatever their ultimate meirts-is "completely" preempted, *i.e.*, properly "recharacterized" as a federal claim brought under § 301 and therefore subject to removal and then to defenses available against that federal claim. I would hold instead that each of the claims should be remanded to state court to be resolved by state law except to the extent that any defenses raised by the employer-

defendant might require interpretation of the collective bargaining agreement, in which case federal labor-contract law should be applied by the state court in assessing those defenses.

I

As indicated, my disagreement with the majority's § 301 preemption analysis is fundamental. And it is a disagreement that simply reflects a wider inter-circuit conflict on this issue that has developed in recent years as the lower federal courts have sought to apply the Supreme Court precedents which, starting in 1985 with *Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985), and including since then, in succession, *International Bhd. of Elec. Workers v. Hechler*, 481 U.S. 851, 107 S.Ct. 2161, 95 L.Ed.2d 791 (1987); *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1988); *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988); and *United Steelworkers of America, AFLCIO–CLC v. Rawson*, —— U.S. ——, 110 S.Ct. 1904, 109 L.Ed.2d 362 (1990), have addressed the issue of § 301's preemptive force in respect of state-law tort claims brought by individual union employees against their employers or unions alleging injuries growing out of or connected with the employment relationship.[1]

Some recapitulation of the principal developments in the evolution of § 301 preemption doctrine is needed to put that issue in context, and to explain the basis for our disagreement upon it in this case.

It all began of course when *Textile Workers Union v. Lincoln Mills of Alabama*, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), established that § 301 not only conferred jurisdiction on federal courts to entertain suits for violation of collective bargaining agreements, but also empowered them to develop a uniform body of federal common law respecting the interpretation and enforcement of such agreements. Soon thereafter it was held that state courts retained concurrent jurisdiction over § 301 suits but were to apply (and to participate in the development of) the body of federal common law governing the interpretation and enforcement of labor-contracts recognized in *Lincoln Mills. Charles Dowd Box Co. v. Courtney*, 368 U.S. 502, 82 S.Ct. 519, 7 L.Ed.2d 483 (1962). And in the same year, the court decided a question reserved in *Lincoln Mills*, that individual employees as well as unions could bring § 301 suits. *Smith v. Evening News Ass'n*, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962).

Inevitably then (though § 301 did not expressly say so) it was also quickly held that, by virtue of the Supremacy Clause, the body of federal common law developed by the federal and state courts in the area covered by § 301, *i.e.*, the interpretation and enforcement of labor-contracts, necessarily displaced any state law concerning such matters. *Local 174, Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962). And critically, the displacing force of federal law in this area was eventually held to be so powerful as to completely preempt some state-law claims, effectively transforming them into claims arising under federal law. *Avco Corp. v. Aero Lodge No. 735*, 390 U.S. 557, 88 S.Ct. 1235, 20 L.Ed.2d 126 (1968) (for removal purposes).

The difficult issue, not fully answered in *Avco*, that then emerged was, what kind of state-law claims are thus completely preempted? The most obvious kind was that dealt with in *Avco* itself, a state-law claim alleging—in direct parallel to a federal § 301 claim—violation or breach of a collective bargaining agreement. Because such a claim is completely and only about the interpretation and enforcement of that agreement, it obviously must be treated as "completely preempted" by the perfectly

---

**1.** These cases unremarkably coincide with the significant erosion during recent years of state-law employment-at-will doctrine and a corresponding more expansive invocation of retaliatory discharge, emotional distress, privacy, and related tort theories in the employment, and other, contexts. *See* White, *Section 301's Preemption of State Law Claims: A Model for Analysis*, 41 Ala.L.Rev. 377, 390–91 (1990).

congruent federal claim under § 301. "Complete preemption" in that situation means treating the state claim as one "transformed" into a § 301 federal claim, with all the jurisdictional, substantive and procedural incidents that then attach to such a claim.

The next inevitable question was whether any state-law claims other than those directly alleging breach of a collective bargaining agreement might also be completely preempted. The answer was yes: § 301 preempts some, but not all, state-law tort claims arising out of or connected with the employment relationship. *Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985). This holding was based primarily on the expressed concern that to limit complete preemption to formally alleged breach of contract claims would "elevate form over substance and allow parties to evade the requirements of § 301 by relabeling their contract claims as claims for tortious breach of contract." *Id.* at 211, 105 S.Ct. at 1911.

Yet the Court was careful to avoid holding, as presumably it might have, that any state tort claim arising out of or connected with the employment relationship must—to avoid manipulation by artful litigation tactics—be found completely preempted. *See id.* at 211–12, 105 S.Ct. at 1911 ("not every dispute concerning employment, or tangentially involving a provision of a collective-bargaining agreement, is pre-empted by § 301 or other provisions of the federal labor law"); *see also Franchise Tax Bd. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 25 n. 28, 103 S.Ct. 2841, 2854 n. 28, 77 L.Ed.2d 420 (1983) ("[E]ven under § 301 we have never intimated that any action merely relating to a contract within the coverage of § 301 arises exclusively under that section."). Instead, complete preemption of employment-related state tort claims was to be limited to those whose "evaluation ... is inextricably intertwined with consideration of the terms of the labor contract," as opposed to being "independent of any right established by contract." *Lueck*, 471 U.S. at 213, 105 S.Ct. at 1912. Or, as the Court put it in an alternative formulation, complete preemp-tion occurs only "when resolution of a state-law claim is substantially dependent upon analysis of the terms of a [collective bargaining agreement]." *Id.* at 220, 105 S.Ct. at 1916.

*Lueck* found the claim there in issue completely preempted under its "independent - or - inextricably - intertwined/substantially dependent" test. Though pleaded as a state-law tort claim for bad faith handling by the employer of the plaintiff-employee's claim for insurance benefits under the employer's fully funded benefit plan, it was manifest from the claim as pleaded that the "tort" duty alleged could only have arisen from the collective bargaining agreement which both provided the insurance benefits and prescribed the claims process. Because the evaluation of such a claim would therefore be "inextricably intertwined with consideration of the terms of the labor contract," it was completely preempted. *Id.* at 213, 216–20, 105 S.Ct. at 1912, 1913–16.

This relatively easy application of the test of complete preemption soon was followed by an equally easy one in *Hechler*, 481 U.S. 851, 107 S.Ct. 2161. There, considering a state-law claim pleaded as one of negligent failure of a union to provide a safe workplace for the plaintiff-union member, the Court, following its *Lueck* analysis, held that it was manifest from the complaint, because expressly pleaded by the plaintiff, that the union's duty of care only arose from "contracts and agreements" between union and employer, so that the claim was completely preempted. *Id.* at 859–62, 107 S.Ct. at 2166–68.

The next critical development came in *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987). In that case, the Court, analyzing an assertion of complete preemption for removal purposes, emphasized important limits on the extent to which defendants' preemption defenses as opposed to plaintiffs' claims were to be considered in deciding complete preemption questions. The case involved state-law claims brought by plaintiffs who over time had been both union and non-union employees. They claimed that in termi-

nating them their employer had breached individual contracts formed while they were not members of the union. The employer sought removal on the basis that the claims were completely preempted because the individual contracts had been "superseded," as a matter of federal labor-contract law, by collective bargaining agreements.

Not so, said the Court. Analyzing the preemption question as a jurisdictional one and addressing it in light of the "wellpleaded complaint" rule and its "independent corollary," the complete preemption doctrine, the Court found the claim not completely preempted and removal therefore improper. The claims were not "substantially dependent" upon interpretation of the collective bargaining agreement. As pleaded, they relied entirely on the plaintiffs' individual contracts as the source of allegedly violated rights, rather than on the collective bargaining agreement; nor did they draw in issue any relationship between the two. *Id.* at 394–95, 107 S.Ct. at 2430–31. The defendant's attempt to insert the collective bargaining agreement as a matter of defense could not create a basis for complete preemption; that was to be determined by the claim as pleaded, not as it might have been pleaded. *Id.* at 397, 107 S.Ct. at 2432. In sum, the Court noted, "a *defendant* cannot, merely by injecting a federal question into an action that asserts what is plainly a state-law claim, transform the action into one arising under federal law, thereby selecting the forum in which the claim shall be litigated." *Id.* at 399, 107 S.Ct. at 2433 (emphasis in original). In such a situation, the state-law claim remains just that and must be remanded. Upon remand, the state court might consider any federal defenses based on the collective bargaining agreement and for that limited purpose might interpret the agreement as a matter of federal law. *See id.* at 398, 107 S.Ct. at 2432–33.

Notwithstanding *Caterpillar*'s emphasis on the absolute primacy of the nature of claims over defenses in assessing whether a statelaw claim was completely preempted, difficulties in application of the test continued in the lower courts. The prob-

lem, in general, was probably traceable to an over-emphasis on the "inextricably intertwined" concept and a failure to appreciate the intended meaning of the "independent" concept in the test first formulated in *Lueck*. In any event, that was the problem that was faced in the Supreme Court's next consideration of the complete preemption issue. In *Lingle*, 486 U.S. 399, 108 S.Ct. 1877, the issue was whether a state-law tort claim of retaliatory discharge in violation of a state statute was completely preempted by § 301. The court of appeals had held that it was, believing that evaluation of the state-law claim would be " 'inextricably intertwined' " with the collective bargaining agreement because " 'the same analysis of the facts' " would be required in processing a grievance claim under the collective bargaining agreement and in a state civil action challenging the discharge. *Id.* at 402, 108 S.Ct. at 1879, *quoting Lingle v. Norge Div. of Magic Chef,* 823 F.2d 1031, 1046 (7th Cir.1987) (en banc).

The Supreme Court reversed, finding the claim not preempted under the test evolved through *Lucas Flour, Lueck, Hechler,* and *Caterpillar.* Looking to the black-letter elements of the state tort claim, as pleaded, to determine whether its resolution required construction of the collective bargaining agreement, *see id.* 486 U.S. at 406–07, 108 S.Ct. at 1881–82, the Court concluded that it did not. The question whether the discharge was or was not retaliatory was purely a factual one turning on the employer's motivation; its resolution would not require interpretation of any term of a collective bargaining agreement, even if the non-retaliatory reason asserted by the employer were one identified as "good cause" in the agreement. *Id.* at 407–08, 108 S.Ct. at 1882–83. The fact that evaluation of the statelaw claim might require attention to the same facts as those evaluated in a "good cause" grievance procedure under the laborcontract was irrelevant to the preemption inquiry. Such parallelism alone did not negate the "independence" of the state claim in the only sense that mattered for § 301 preemption purposes:

that resolution of the claim did not require construction of the labor-contract. *Id.* at 409–10, 108 S.Ct. at 1883–84.

In holding the claim not completely preempted, the *Lingle* Court observed in an important aside that such a holding did not mean that issues requiring interpretation of the collective bargaining agreement might not remain for resolution by the state court on remand. In such a case, "although federal law would govern interpretation of the agreement ... the underlying statelaw claim, not otherwise pre-empted, would stand." *Id.* at 413 n. 12, 108 S.Ct. at 1885 n. 12.

The final development to date involves the Supreme Court's application of the *Lueck–Hechler–Caterpillar* test, as clarified in *Lingle,* in *United Steelworkers of America, AFL–CIO–CLC v. Rawson,* —— U.S. ——, 110 S.Ct. 1904, 109 L.Ed.2d 362 (1990). In that case, survivors of union miners killed in a mine accident brought a state-law wrongful death action against the miners' union in state court. The complaint alleged, as the proximate cause of the accident causing deaths, fraud and negligence by the union's representatives in conducting mine safety inspections pursuant to a collective bargaining agreement.

The case posed a particularly difficult conceptual problem for application of the *Lueck–Caterpillar–Lingle* complete preemption test, a difficulty that in fact led to the first division within the Court in any of its line of cases dealing with § 301 preemption of employment-related state tort claims. In applying *Lingle's* analytical framework which centers on the elements of the claim as advanced by plaintiff to determine its "independence," the special difficulty arose from the two different ways in which the claim could be viewed. The majority held in the end that because the claim, as originally pleaded and developed through discovery and summary judgment proceedings, located the duty allegedly breached by the union in the collective bargaining agreement, it was completely preempted, in the same way and for the same reasons that the claims in *Lueck* and *Hechler* were. *Id.* 110 S.Ct. at 1909–11.

But there was another way of looking at the claim. As eventually structured by the plaintiffs (undoubtedly now educated to the perils flowing from their original location of the duty's source in the collective bargaining agreement) it located the duty's source in the union's having undertaken, for whatever reason, to perform safety inspections. This invoked a respectable common law theory of tort liability which finds duty simply in the actual undertaking of duty, and does not look behind its undertaking. *See Restatement (Second) of Torts* § 323. This was indeed the theory actually accepted by the state's highest court in finding the claim not preempted under the *Lingle* analysis, and for exactly the reasons that the *Lingle* claim of retaliatory discharge was held not preempted. A minority of the Supreme Court thought this the right view to take of the claim— largely because the state's highest court had so interpreted it under state law—and would have held it not preempted under the *Lingle* analysis. *Id.* 110 S.Ct. at 1913–15 (Kennedy, J., dissenting).

### III

I have run rather laboriously through this familiar line of cases because I believe the exercise necessary to demonstrate why, in my view, the majority's preemption analysis (and that of some other courts) is flawed, and probably where it got off track.

The run-through takes us back to the origins of § 301 complete preemption doctrine—in § 301 itself—and illustrates a consistent, unvarying approach by the Supreme Court to keep the scope of this particular federal preemption of state-law claims properly confined to that statutory source.

Section 301(a) only authorizes suits in federal court (by union-employees or their unions) "for violation of [labor] contracts"; it does not authorize suits in federal court to enforce any claim by a union-employee against his employer or union that arises out of or is connected with his employment relationship, or that somehow touches on matters that might be the subject of labor-

contract terms. 29 U.S.C. § 185(a). The limited scope of the federal claims authorized, hence made subject to federal law, by § 301(a), dictates a comparably limited scope for the preemptive force of that statute. It obviously preempts state-law claims formally alleging violations of labor contracts—the exact and only kind expressly made federal ones by § 301. Beyond those, it only preempts, as a matter of judicial interpretation, state-law claims that can be determined to be claims for violation of laborcontracts in substance though not in form, and those only out of the felt necessity that parties not be allowed "to evade the requirements of § 301 by relabeling their contract claims as claims for tortious breach of contract." *Lueck*, 471 U.S. at 211, 105 S.Ct. at 1911.

This is the true principle that underlies the Supreme Court's various formulations focussing on whether the state-law claim is "independent" of any labor contract or, instead, is one whose "evaluation ... is inextricably intertwined with consideration of the terms of the labor contract" or "is substantially dependent upon analysis of [such] terms." *Id.* at 213, 220, 105 S.Ct. at 1912, 1915–16. Each of these formulations is designed to focus inquiry on the only way in which a state-law claim that is not formally cast as one for breach of a labor contract can nevertheless be found to be one in substantive effect, so that it also is preempted by § 301.

This basic principle consistently has informed both the rationale and the result in each of the Supreme Court's § 301 preemption cases. Where the claim has been determined to be one for violation of a labor

contract in substance though not in form, preemption has resulted, *see Lueck, Hechler, Rawson;* where it has been determined not to be such, preemption has not resulted, *see Caterpillar, Lingle.* The analytical technique used by the Court in determining whether the claim was actually one for violation of a labor contract in disguise or in substantive effect, has been to focus on where the claimant has located the duty allegedly breached by the employer or union-defendant. Where, though advanced as a tort or otherwise "independent" claim, it has been apparent that the duty allegedly violated could *only* have been created by the labor contract, preemption has resulted, *Lueck* (employer's contractual duty to process insurance claims); *Hechler* (union's contractual duty to provide safe workplace); *Rawson* (union's contractual duty to make safety inspections); where the duty allegedly violated has plausibly been located "independently" of any labor contract, in general tort law or elsewhere, preemption has not resulted, *Caterpillar* (employer's duty under individual employee contracts); *Lingle* (employer's general statutory duty not to discharge retaliatorily).

Important in this analytical approach has been the Court's steadfast concentration on the nature of the claim advanced rather than any defense put forward as determinative of the dispositive duty-location issue—for the very good reason that a defendant's defensive positions are irrelevant to the issue whether a plaintiff's claim is, in form or substance, one for violation of a labor contract, *see Caterpillar*, 482 U.S. at 398–99, 107 S.Ct. at 2432–33.[2] Or, re-

---

**2.** A passage in the *Lingle* opinion may seem to draw this proposition in question, and might well be one of the causes for continued disagreement on this point among the lower courts.

In analyzing the Illinois tort of retaliatory discharge, the Court not only noted that proving the elements of the claim would present "purely factual questions" that would not "require[ ] a court to interpret any terms of a collective-bargaining agreement," but that the "purely factual inquiry" prompted by a defense of a non-retaliatory reason "likewise does not turn on the meaning of any provision of a collective-bar-

gaining agreement." *Lingle*, 486 U.S. at 407, 108 S.Ct. at 1882.

This obviously may be read—as some courts surely have read it—to imply that preemption can turn on the nature of a defense grounded in a labor contract, as well as on the nature of a plaintiff's claim. If this were considered a holding of the case, it concededly would pose real problems for the position taken in this dissenting opinion. With all respect, I suggest that it may not be so considered—for three reasons.

First, if it were read as a flat holding that a federal defense (conduct justified by provisions of a labor contract) could transform a well-pleaded state-law claim into a federal action

turning again to the preemption source, for the very good reason that § 301 simply does not federalize all union or union-employee claims to which an employer-defendant interposes a defense based on the terms of a labor contract.[3]

Where the preemption issue is raised jurisdictionally as a basis for removal, the Court's concentration on the dispositive nature of the claim is realized through application of the well pleaded complaint rule, see Caterpillar, 482 U.S. at 392–93, 107 S.Ct. at 2429–30, but the same claim-centered analysis is followed where preemption has been raised and is addressed as a defense on the merits, see, e.g., Rawson (§ 301 preemption raised and litigated as federal defense in state court action).

If this be an accurate assessment of the right way—because it is the Supreme Court's way—to analyze a § 301 complete preemption issue, it is obvious that the majority here, and some other courts, have gotten off the track. Of course I think they have, and I venture the following possible explanation.

Where they have strayed is in looking beyond the plaintiffs' claims to the merits of defendants' § 301 preemption positions

(whether raised as a jurisdictional basis for removal of, or as a substantive defense to, a state-law claim) to determine whether the claim is completely preempted. As indicated, this approach has been rigorously avoided, and indeed positively rejected, by the Supreme Court. When courts nevertheless follow it, as does the majority here, they are led to ask the irrelevant question whether "evaluation" of the total action (claims and defenses), rather than of the claim alone, will be "inextricably intertwined with consideration of the terms of the labor contract." And where, as in this case for example, an employer asserts defensively that the legal justification for its allegedly tortious conduct is found in a labor contract, a court looking to both claims and defenses obviously will answer yes, and find preemption.

I think the Supreme Court precedents demonstrate that this is an incorrect approach. What it seems to miss is that the mere fact that the need for some interpretation of a labor contract's terms may appear inevitable, based upon the issues joined by the parties (whether by removal petition or by answer on the merits), does not of itself demonstrate that the claim is completely preempted. As demonstrated

arising under § 301, it would directly contradict the flat holding to the contrary in Caterpillar. See id. 482 U.S. at 398–99, 107 S.Ct. at 2432–33 (even federal defense of waiver by labor contract does not transform action into one arising under federal law; defense is one for resolution by state court on remand). Lingle does not purport to overrule or to question Caterpillar, but indeed expressly recognized that earlier decision's continued authority. See Lingle, 486 U.S. at 410 n. 10, 108 S.Ct. at 1883–84 n. 10. This suggests that the passage was not intended as a holding and should not be so considered.

Second, in context, the Lingle Court's reference to the nature of the non-retaliatory reason defense is best read as "even if" dicta in relation to the preemption issue. The thrust of the Court's discussion at that point is that litigation of this particular retaliatory discharge action necessarily will turn on the issue of employer motivation; that this is purely factual in whatever of its dimensions the case is viewed; that accordingly there is no prospect that any terms of the labor contract will require interpretation even if employer defense as well as employee claim were taken into account.

Finally, no other decision in the line of Supreme Court cases even intimates that in mak-

ing the preemption analysis—whether for removal or substantive defense purposes—it is appropriate to inquire whether resolution of a defense will require interpretation of a labor contract. Lingle therefore may only be harmonized—as an intermediate decision in the line—by treating the passage as dicta.

3. Indeed, in conducting a proper § 301 preemption analysis, the terms of a labor contract raised as the basis of a preemption defense to a state-law tort claim need be looked to by the court only in quite limited circumstances and for a quite limited purpose. Where the tort theory invoked, though general in its reach, has a duty element that necessarily is based on a contractual relationship, the labor contract is appropriately inspected to see if it supplies the specific contractual duty in the case at hand. This, as noted in Lingle, 486 U.S. at 405, 108 S.Ct. at 1881, was the situation presented in Lueck, where the tort claim for negligent processing of an insurance claim necessarily implied an insurance-contract relationship between the parties. 471 U.S. at 213–16, 105 S.Ct. at 1912–14. The labor contract was appropriately looked to to confirm that it did indeed include insured-insurer provisions.

by all the Supreme Court's later decisions, that is not what is implied by the "inextricably-intertwined/substantially dependent" formulations in the original *Lueck* test.

In any event, whatever may be the exact basis of the majority's view here and of the nature of our disagreement upon the matter, I think the Supreme Court precedents above reviewed establish the following critical rules for determining whether a state-law tort claim is completely preempted by § 301.

1. The primary rule is that whether such a claim is preempted depends entirely upon whether the claim, as defined by state law and as specifically advanced by the claimant, locates the "tort" duty allegedly violated by a defendant in the terms of a labor contract or in some other source independent of any such contract.

2. In determining whether a claim locates an alleged tort duty in a labor contract or in another source, a defendant's assertions (whether for removal purposes or as a defense on the merits) that a labor contract's terms provide either a negating or affirmative defense to the claim are irrelevant to the preemption issue.

3. When, as in this case, the preemption issue is raised as a basis for removal of a state-court action to federal court, the above rules are applied as special cases of the "well-pleaded complaint" rule for purposes of determining federal jurisdiction.

4. Upon a determination under the above rules that a statelaw claim is not completely preempted, the *action* is to be resolved under state law, except to the extent that its ultimate resolution requires interpretation of a labor contract's terms, in which event federal law controls the interpretation. Such a resolution may be by a state court, either on remand from federal removal or following its own determination of non-preemption.

## IV

Applying these rules to the various claims advanced by plaintiff here, I would, as indicated, find none preempted by § 301,

and would therefore remand all to state court for resolution in accordance with this opinion.

## A

I first consider the intentional infliction of emotional distress claim.

The majority, following the approach I have earlier criticized, essentially finds this claim preempted because, in common with all the other claims, its proof necessarily will require proof of "wrongful conduct" by the employer. From this, the reasoning proceeds that inevitably this will require proof of all the circumstances relevant to the conduct's occurrence; that one of these circumstances will be the labor contract between the parties; that this will require interpretation of that contract, and that that does it: the claim is preempted. Op. 535–536. The majority then proceeds to demonstrate in considerable detail how various provisions of the labor contract may bear upon the ultimate factual issue of whether AT & T's conduct was "outrageous" or instead completely reasonable in light of the contract. *Id.* at 536–537.

This analysis of how litigation of this claim in a civil action probably would proceed is likely an accurate one, but in my view it is irrelevant to the much simpler, true preemption issue: whether McCormick's well-pleaded state-law tort claim locates the duty allegedly violated by AT & T in their labor contact or in some source of legal duty independent of that contract. The answer to that issue is plain: in an independent source, Virginia tort law. Specifically, in the duty imposed by that body of law upon all persons, running to society in general and not dependent upon any employment relationships, (1) not to engage in intentional or reckless conduct (2) that is outrageous and intolerable, offending generally accepted standards of decency, and (3) that causes (4) severe emotional distress to a plaintiff. *Womack v. Eldridge,* 215 Va. 338, 210 S.E.2d 145, 148 (1974). McCormick's claim obviously does not seek to locate any such duty, either expressly or by necessary implication, in any special obligation imposed on AT & T by its labor

contract, as did the preempted claims, for example, in *Lueck, Hechler,* and *Rawson.*

The fact that in defending against the claims in a civil action AT & T may be entitled (though this is not a sure thing) to rely on provisions of its labor contract to demonstrate that its conduct in conformity with them could not be considered "outrageous" is at this point in the process beside the point. That would be to invoke a federal defense (the labor contract's terms) and such defenses cannot transform McCormick's well-pleaded state-law tort claim into a federal claim under § 301. *See Caterpillar,* 482 U.S. at 399, 107 S.Ct. at 2433. If such a federal defense is offered and admitted at trial, it may be resolved by the state court on remand, applying federal labor contract law if needed to interpret any terms of the contract. *See id.* at 397, 398 n. 13, 107 S.Ct. at 2432, 2433 n. 13; *Lingle,* 486 U.S. at 413 n. 12, 108 S.Ct. at 1885 n. 12.[4]

### B

Exactly the same analysis applies to the claim of negligent infliction of emotional distress.

Here again, the majority rests its preemption determination on the ground that to prove this claim McCormick must prove that AT & T's conduct was wrongful; that whether it was wrongful will depend on the circumstances; that one of the circumstances inevitably will be any terms of the labor contract relevant to the conduct; and that this will require interpretation of the contract.

Here again, this analysis simply misapplies the relevant test. Rightly applied, that test would find that McCormick's "wellpleaded" complaint located the duty

allegedly violated by AT & T not in any terms of its labor contract but in Virginia's general tort law.

### C

The conversion and negligent bailment claims present only slightly different problems for application of the proper preemption test, and its application to each also demonstrates nonpreemption.

### (1)

McCormick's conversion claim invoked Virginia's common law remedy for that tort, which is defined as " 'any wrongful exercise or assumption of authority, personally or by procurement, over another's goods, depriving him of their possessin.' " *Universal C.I.T. Credit Corp. v. Kaplan,* 198 Va. 67, 92 S.E.2d 359, 365 (1956), *quoting Buckeye Nat'l Bank v. Huff & Cook,* 114 Va. 1, 75 S.E. 769, 772 (1912). As specifically pleaded, the claim is effectively one that at some point in the process of removing his personal effects from his locker and then disposing of them, AT & T agents "wrongfully exercised or assumed authority over his goods, depriving him of their possession." *See id.* As such, this is a well-pleaded state law conversion claim which does not, as did the claims in *Lueck, Hechler,* and *Rawson,* locate the tort duty allegedly violated in a labor contract. Instead, it located it, independently of any contract, in the general duty owed by all persons under Virginia law not to convert *any* other person's property. That the labor contract may, as AT & T asserts defensively, have much to say about the way in which employees' lockered property may be handled by the employer upon separation, and may even provide a defense to the conversion claim here, is irrelevant to the

---

**4.** The majority properly notes that its analysis finding preemption of the intentional infliction of emotional distress claim is in accord with those of the Ninth and Seventh Circuits. See op. at 537. The Fifth Circuit also recently held that § 301 preempted an intentional infliction of emotional distress claim. *Brown v. Southwestern Bell Tel. Co.,* 901 F.2d 1250 (5th Cir. 1990).

It should be noted here that the Third and Sixth Circuits agree with the view expressed in this dissent that such claims are not preempted. *See Krashna v. Oliver Realty, Inc.,* 895 F.2d 111 (3d Cir.1990); *O'Shea v. Detroit News,* 887 F.2d 683 (6th Cir.1989).

The Eighth Circuit has ruled both ways on intentional infliction of emotional distress claims. *Compare Hanks v. General Motors Corp.,* 906 F.2d 341 (8th Cir.1990) (emotional distress claim not preempted) *with Johnson v. Anheuser Busch, Inc.,* 876 F.2d 620 (8th Cir. 1989) (emotional distress claim preempted).

preemption inquiry. As in the case of the claims for infliction of emotional distress, this would be a matter of federal defense to be determined under federal law governing the interpretation of labor contracts, but as a defense it could not have the effect of transforming the statelaw claim into one under § 301.

### (2)

The claim of bailee-negligence, rightly analyzed, yields the same result, non-preemption.

McCormick's well-pleaded claim here invokes the Virginia common law rule that one who comes into lawful possession of another's property and exercises control over it, thereby becomes a bailee of the property, with a duty to account for it to the bailor. Under Virginia law, " 'it is the element of lawful possession, however created, and duty to account ... that creates the bailment, regardless of whether or not such possession is based on contract in the ordinary sense.' " *Morris v. Hamilton,* 225 Va. 372, 302 S.E.2d 51, 52 (1983), *quoting K–B Corp. v. Gallagher,* 218 Va. 381, 237 S.E.2d 183, 185 (1977).

Here McCormick's specific claim, as pleaded, was that after AT & T's representative came into lawful possession of his property, she thereafter failed negligently to account for the property as was her duty. J.A. 13. In the clearest possible way, this claim does not locate the duty allegedly violated in the labor contract, but in the duty imposed by general Virginia law upon anyone exercising lawful possession, *"however created,"* over another's property. Indeed, to the extent this claim makes even an implicit reference to any legal effect flowing from the labor con-

tract, it is to concede by the allegation of AT & T's originally *lawful* possession that the duty to account as bailee did not arise from any preexisting contractual relationship.

Because this claim, as do the others, locates the tort duty allegedly violated in a body of tort law independent of any labor contract, it should be found not preempted.

### V

It cannot be gainsaid that to find employment-related statelaw tort claims not preempted by § 301 has the effect of diverting from arbitration some workplace disputes that could be—and from the standpoint of national labor policy, might better be—grieved and resolved by that preferred means. And, to a less certain extent, it cannot be gainsaid that the goal of national uniformity in labor law is thereby threatened.[5] Some commentators have deplored these twin consequences of non-preemption and urged as an antidote an expansive judicial view of § 301's preemptive scope.[6] And some courts undoubtedly have been influenced by these policy concerns in adopting the expansive views of preemption with which this dissenting opinion disagrees. The majority here expressly alludes to both. Slip op. 15.

I conclude with an observation about those policy concerns.

The preemption policy at issue is a matter for Congress and not for the courts. The basic policy decision against which some now chafe because of concerns about threats to arbitration and uniformity of labor law, was made by Congress when it deliberately chose the critical federalizing prescription, "violation of [labor] contract," in § 301(a).

---

**5.** I say to a lesser extent for two reasons. First, because state courts, like federal, are bound to apply federal law in their interpretations of labor contracts. While it may be supposed by some that they could be less "expert" in their applications of uniform federal law, it cannot be supposed by any that they will be less faithful in the effort. Second, and more critically, because it is difficult to see how there will be much true "contract interpretation" in adjudicating state-law tort claims to which various terms of labor contracts may have some eviden-

tiary relevance as defenses. For the most part, the relevance of such terms would seem to be confined to offering plausible factual alternatives to the motivational basis for particular employer or union conduct. *See Lingle,* 486 U.S. at 407, 108 S.Ct. at 1882 (pointing out primarily factual context of litigation concerning employer's alleged retaliatory discharge of employee).

**6.** *See supra* note 1.

The scope of § 301's preemptive force was set by and remains anchored to that rather narrow language. As earlier indicated, the prescription might have been put differently—as a matter of policy. Congress might deliberately have chosen to federalize a broader scope of labor disputes—pehaps even to include all "suits touching upon any workplace conditions or relationships." (And the Supreme Court might presumably still have followed up on such an expanded scope definition with *Lincoln Mills, Dowd Co., Avco,* and the rest of the fleshing-out decisions.) But Congress did not and has not done so.

The result is that this preemption-defining prescription leaves little room for judicial interpretation based on perceived policy concerns about the virtues of federal preemption in this area. And when the issue is encountered in a removal context, the special procedural constraints imposed by the well-pleaded complaint rule only confirm the quite narrow range of permissible pro-preemption judicial interpretations of § 301's scope.

I read the critical Supreme Court decisions above reviewed as simply reflecting a faithful adherence to the plain language of this statutory prescription: in addition to formal, express claims for violations of labor contracts, only those that are such in substantive effect are preempted. And I read the Court's claimcentered analysis, concentrated on whether the claimant has located the duty allegedly violated in a labor contract, as the obvious and only way to confine preemption to this scope.

By contrast, the much more expansive scope for § 301 preemption adopted by the majority here effectively rewrites Congress' much more cautious preemption of state law in the realm of labor disputes.

I would reverse and direct remand of all the claims to state court for resolution.

MURNAGHAN and SPROUSE, Circuit Judges, join in this dissent.